Brandie Marie BLAKELY, Plaintiff,

v.

AUSTIN–WESTON CENTER FOR COSMETIC SURGERY L.L.C., et al., Defendants.

No. 1:04CV458.

United States District Court, E.D. Virginia, Alexandria Division.

Dec. 7, 2004.

Kim Michele Keenan, Karen Elizabeth Evans, Jack H. Olender & Associates PC, Washington, DC, for Plaintiff.

Reginald Harrison Pledger, Jr., Pledger & Feord PLC, Chantilly, VA, for Defendants.

## ORDER

ELLIS, District Judge.

The medical malpractice action is before the Court on defendants' motion to strike and/or for partial summary judgment on punitive damages. At the November 18, 2004 pretrial conference, plaintiff was directed to file a response to defendants' motion to strike punitive damages and in opposition to summary judgment. *See Blakely v. Austin–Weston Ctr. for Cosmetic Surgery L.L.C.*, Case No. 1:04cv458 (E.D.Va. Nov. 18, 2004). Plaintiff complied by filing supplemental briefing on November 26, 2004. Because the facts and legal contentions are adequately set forth in the record, further oral argument is dispensed with and the matter is decided on the existing record. For the reasons stated below, defendants' motion to strike and/or for partial summary judgment on punitive damages must be granted.

## I.

Plaintiff Brandie Marie Blakely, a Maryland resident, brings this diversity medical malpractice suit for harm suffered when she was mistakenly injected with epinephrine, rather than an anti-nausea drug, following a liposuction procedure. Defendant Byron D. Poindexter, a Virginia resident, is a reconstructive and plastic surgeon licensed in the Commonwealth of Virginia and Defendant Austin–Weston Center for Cosmetic Surgery L.L.C. ("Austin–Wes-

ton"), a Virginia company, is a surgical facility engaged in reconstructive and cosmetic surgery.[1]

On April 19, 2002, plaintiff came to Austin–Weston for liposuction surgery, which Poindexter performed. At the surgery's conclusion, Poindexter ordered the intravenous administration of anzemet, an anti-nausea medication prescribed for the prevention and treatment of post-operative nausea or vomiting. Yet, plaintiff did not receive anzemet; rather, as conceded by defendants, Poindexter negligently administered the wrong medication—undiluted epinephrine. Shortly thereafter, plaintiff began to react to the epinephrine and had to be taken by ambulance to the hospital. Plaintiff claims that the negligent administration of the epinephrine caused her to suffer "severe pulmonary and cardiac anomalies, including near death." Complaint ¶ 25.

Plaintiff was not the first patient at the Austin–Weston Clinic in 2002 to receive epinephrine in error. On January 3, 2002, two patients, one under Poindexter's care, were also hospitalized after they were mistakenly given epinephrine intravenously. Both of these incidents occurred in the pre-operative context and in both a nurse or surgical technician mistakenly administered epinephrine instead of decadron, an anesthetizing drug used for cosmetic surgery. The two patients suffered their injuries on the same day, but Austin–Weston and its employees did not discover that epinephrine was the cause of the first patient's reaction until the second patient presented similar symptoms.

The record does not establish with certainty how these two patients mistakenly received epinephrine. Following the incidents on January 3, 2002, defendants investigated both incidents. In the course of this investigation, defendants found a multi-use vial of epinephrine in the decadron's normal location in the operating room and retrieved from the trash eight 3–cc syringes, the volume used to administer decadron. Defendants' evidence further reflects that laboratory analysis of these syringes conclusively showed that all but one syringe contained decadron; a single syringe contained a high concentration of epinephrine.[2] Based on the investiga-

---

1. Defendant Jane Doe, R.N., was named in the complaint as an unknown person or persons who provided health care assistance to defendants Poindexter and Austin–Weston. The designation of a Jane Doe is appropriate "only when the identity of the alleged defendant is not known at the time the complaint is filed and the plaintiff is likely to be able to identify the defendant after further discovery." *Njoku v. Unknown Special Unit Staff,* 217 F.3d 840, 2000 WL 903896, at *1 (4th Cir.2000) (unpublished disposition) (citing *Roper v. Grayson,* 81 F.3d 124, 126 (10 Cir. 1996)). "If it does not appear that the true identity of an unnamed party can be discovered through discovery or through intervention by the court, the court could dismiss the action without prejudice." *Schiff v. Kennedy,* 691 F.2d 196, 197 (4th Cir.1982). Discovery in this case has closed and the record facts make clear that Poindexter administered the epinephrine himself without assistance. Because plaintiff has failed to identify the unnamed defendant during discovery and because it does not appear that she can do so, the Doe defendant is dismissed without prejudice. Thus, "defendants" herein refers only to Poindexter and Austin–Weston, collectively.

2. Two defense witnesses, Drs. Robert K. Sigal and George W. Weston, stated in sworn deposition testimony that the laboratory results reflected that a single syringe contained epinephrine. Yet, plaintiff claims that the laboratory results show that all recovered syringes contained decadron and that none contained epinephrine. Plaintiff attached to her supplemental briefing filed on November 26, 2004 a purported copy of the laboratory results, but she included no affidavit to attest that the attached exhibit represents the full laboratory records received by Austin–Weston or that plaintiff's conclusions drawn from these affidavits are accurate.

tion, defendants concluded that the two January 3, 2002 incidents occurred when a nurse or surgical technician mistakenly confused a multi-use vial of epinephrine that had been brought into the operating room for a multi-use vial of decadron, as the vials are nearly identical in appearance. Defendants further concluded that either the same person, or different persons at different times on January 3, 2002, mistakenly drew up syringes of the epinephrine for use in the day's surgical procedures. Shortly thereafter, Sanjay Garg, a surgical technician, admitted to defendants that he had mistakenly drawn up the epinephrine. It is unclear whether Garg was responsible for both administrations of epinephrine on January 3, 2002, or only the first.

Following the incidents on January 3, 2002, Austin–Weston implemented a number of changes in its policies and procedures in an attempt to prevent similar reoccurrences in the future. Specifically, Austin–Weston adduced evidence that it

    (i) converted from multi-use vials of epinephrine to single-use vials to distinguish epinephrine from decadron with greater ease,

    (ii) began to store the epinephrine in a locked medications cart in a preparation room adjacent to the operating room,

    (iii) implemented a policy that physicians must either directly administer medications themselves or directly supervise any medication given by technicians or other employees,

    (iv) posted signs to remind employees to double-check medications,

    (v) assigned an additional registered nurse to the operating rooms,

    (vi) used nurse anesthetists more regularly, and

    (vii) attempted to change the culture by devoting a portion of the regular Austin–Weston Monday morning staff meeting to patient safety.[3]

Four months later, despite these new procedures, plaintiff was also mistakenly injected with epinephrine. The record on this incident reflects that Poindexter planned to administer to plaintiff an anti-nausea drug, opened a drawer in the medicine cart, and selected a single-use ampoule from the location in the drawer where he had previously removed the desired medication, anzemet. At that time, both anzemet and epinephrine were stored in single-use ampoules. Poindexter concedes that he negligently failed to read the label on the ampoule to double-check that he had selected the correct medicine, and thus negligently administered epinephrine to plaintiff through her IV.

■■■ Plaintiff filed the complaint in this case on April 21, 2004 alleging $1,250,000 in compensatory damages and $350,000 in punitive damages.[4] On August

---

**3.** Plaintiff argues that defendants have failed to produce any documentation to prove that Austin–Weston implemented or effectively conveyed these new policies to its employees. Yet, evidence of these policy changes is found in the sworn deposition of at least three defense witnesses, Drs. Sigal, Weston, and Poindexter. Plaintiff cannot create a disputed issue of fact merely by denying that these policy changes were implemented or that they were implemented effectively. To defeat a motion for summary judgment, the non-moving party "may not rest upon mere allegations or deni-

als ... but must set forth specific facts showing that there is a genuine issue [of material fact]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**4.** Defendants note in their motion to strike plaintiff's claim for punitive damages that plaintiff originally filed this suit in the Fairfax County Circuit Court on April 1, 2003. During the course of the state proceedings, defendants demurred three times to plaintiff's punitive damages claim. On the first two occasions, the court sustained the demurrer

27, 2004, defendants filed a motion to strike plaintiff's claim for punitive damages. Plaintiff filed an opposition on September 9, 2004, and defendants withdrew their motion on September 16, 2004. At the November 18, 2004 pre-trial conference, defendants orally renewed their motion as a motion for partial summary judgment on punitive damages. Plaintiff was directed to file supplemental briefing and the matter is decided here without further oral argument.

## II.

Summary judgment is appropriate only when there is no issue of material fact and the movant is entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P.; *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).[5] While it is true that on summary judgment the facts must be viewed in a light most favorable to the non-moving party, it is equally true that the non-moving party "may not rest upon mere allegations or denials ... but must set forth specific facts showing that there is a genuine issue [of material fact]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Matsushita Elec. Indus. Co v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct.

1348, 89 L.Ed.2d 538 (1986). Moreover, "the mere existence of some disputed facts does not require that a case go to trial," rather, "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate to support a jury verdict." *Thompson Everett, Inc. v. Nat'l Cable Adver., L.P.,* 57 F.3d 1317, 1323 (4th Cir.1995) (citing *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505).

## III.

■ Virginia law "imposes a heavy burden on a plaintiff seeking punitive damages." *Cummings v. Fisher–Price, Inc.,* 857 F.Supp. 502, 505 (W.D.Va.1994). Indeed, in Virginia, the standard for establishing punitive damages is beyond even gross negligence. *Doe v. Isaacs,* 265 Va. 531, 579 S.E.2d 174, 178 (2003) (complete neglect of others' safety amounted to gross negligence, which shocks fair-minded people, but was less than willful recklessness required for punitive damages); *Owens–Corning Fiberglas Corp. v. Watson,* 243 Va. 128, 413 S.E.2d 630 (1992). Instead, to sustain a claim for punitive damages in a personal injury case, the plaintiff must demonstrate " '[n]egligence which is so willful or wanton as to evince a conscious

with leave to amend, and immediately before the December 5, 2003 hearing on the third demurrer, plaintiff elected to take a voluntary nonsuit pursuant to Virginia Code § 8.01–380. The statute of limitations for a nonsuited action is tolled by the commencement of the nonsuited action and the suit may be recommenced within six months of the date of the nonsuit order. *See* Va.Code § 8.01–229. Thus, although plaintiff filed her federal suit more than two years after her claim accrued on April 19, 2002, plaintiff's claims are not barred by Virginia's two-year statute of limitations on medical malpractice claims. *See* Va.Code § 8.01–243.

**5.** Because jurisdiction is based on diversity grounds, state law, including state choice of law rules, governs the substantive claims. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Yet importantly, it is equally settled that a different result obtains with respect to procedural matters; they are governed by federal law, specifically the Federal Rules of Civil Procedure. *See Hanna v. Plumer,* 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). Virginia's standards governing summary judgment arguably are more restrictive than the federal standards and hence plaintiff's reliance on the state standards is misplaced. *See id.*

disregard of the rights of others, [or] malicious conduct ....'" *Doe,* 579 S.E.2d at 176 (quoting *Booth v. Robertson,* 236 Va. 269, 374 S.E.2d 1, 3 (1988)). The Supreme Court of Virginia has further defined "willful and wanton negligence" as " 'action undertaken in conscious disregard of another's rights, or with reckless indifference to consequences with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another.'" *Id.* (quoting *Woods v. Mendez,* 265 Va. 68, 574 S.E.2d 263, 268 (2003)). The purpose of punitive damages is to "punish the wrongdoer if he has acted wantonly, oppressively, or with such malice as to evince a spirit of malice or criminal indifference to civil obligations. Wilful or wanton conduct imports knowledge and consciousness from the act done." *Giant of Virginia, Inc. v. Pigg,* 207 Va. 679, 152 S.E.2d 271, 277 (1967). Thus, as Judge Michael concluded in *Cummings,* the Virginia cases upholding punitive damages have involved conduct that "either approaches actual malice or exhibits extreme recklessness resulting in clearly foreseeable and immediate injury." *Cummings,* 857 F.Supp. at 505. Construing the facts in the light most favorable to plaintiff, plaintiff has failed to identify any genuinely disputed material facts that would allow plaintiff to carry the heavy burden required in Virginia to warrant punitive damages against Poindexter or Austin–Weston.

### 1. Poindexter

■ Poindexter concedes that he negligently failed to read the vial's label before administering epinephrine to plaintiff. Thus, the only question at issue is whether his actions evinced a "conscious disregard" for plaintiff's rights or "reckless indifference" to the fact that his conduct likely would cause plaintiff injury. First, Poindexter's failure to read the label does not,

by itself, support a claim for punitive damages. A negligent act, even if intentional, does not automatically amount to willful or wanton negligence. *See Alfonso v. Robinson,* 257 Va. 540, 514 S.E.2d 615, 618 (1999) ("[T]he intentional violation of a traffic law, without more, will not support a finding of willful and wanton negligence."). Poindexter reached into a drawer in a locked medicine cabinet where he believed the anzemet was regularly stored, and withdrew an ampoule that was the correct size and appearance, and concluded that he had selected the correct medication. His failure to read the label was clearly negligent; an ordinarily prudent person would have carefully checked the label. Although this amounted to negligence, perhaps even gross negligence, "shock[ing] fair-minded people," it plainly falls short of willful recklessness. *See Doe,* 579 S.E.2d at 178; *Harris v. Harman,* 253 Va. 336, 486 S.E.2d 99, 101–02 (1997) ("[W]illful and wanton negligence generally involves some type of egregious conduct—conduct going beyond that which shocks fair-minded people."). Thus, defendant's negligent failure to read the label does not support a claim for punitive damages.

Plaintiff argues that a reasonable jury could award punitive damages because Poindexter knew that mistaken administrations of epinephrine to other Austin–Weston patients just four months earlier had caused them to suffer harmful health effects. Yet, multiple like occurrences, on their own, are not sufficient to warrant punitive damages. *See Hack v. Nester,* 241 Va. 499, 404 S.E.2d 42, 45 (1991) (holding that defendant with two prior drunk driving convictions who consumed pitcher of beer prior to accident did not act with conscious disregard for plaintiff's safety). Rather, to support a claim for punitive damages, the circumstances of the two in-

cidents must be sufficiently similar to raise an inference that the actor, aware of the first incident, must have consciously disregarded a risk that the harm would be repeated. *See, e.g., Kuta v. Newberg,* 600 N.W.2d 280, 289 (Iowa 1999) (rejecting plaintiff's argument for punitive damages in reliance on conclusion that two prior, unrelated accidents demonstrated defendant was unfit to drive); *Gulf Power Co. v. Kay,* 493 So.2d 1067, 1074 (Fla. 1st DCA 1986), *review denied,* 504 So.2d 767 (Fla. 1987) (reversing punitive damages award for failing to remove light pole based on evidence of prior accidents at same location when prior accidents not sufficiently similar).

To illustrate this point, consider a case in which a defendant's negligent operation of his vehicle has caused multiple prior accidents; he is not necessarily liable for punitive damages if he again drives carelessly resulting in an accident. For example, if he caused one accident when he ran a red light and another when he followed the car in front of him too closely, his first accident would not raise an inference that he consciously disregarded the risk that his negligent driving in the second incident would result in harm to another. Yet, if the defendant previously caused multiple accidents, each time because he failed to wear his glasses, these prior accidents may well allow a reasonable jury to conclude that the defendant consciously disregarded the risk that he would cause yet another injury by driving again without his glasses, and thus award punitive damages.

Similarly, had Poindexter on a previous occasion selected a medication from the same drawer, believing it to be an anti-nausea medicine, and then mistakenly administered epinephrine, just as he did in this case, then the similarity of the episodes might give rise to an inference that he consciously disregarded the risk that he could be making the same mistake again. Here, however, while epinephrine was erroneously administered to patients on two separate occasions, the facts, as Poindexter understood them, were different.[6] Poindexter believed that on January 2002 a surgical technician had mistaken a multi-use vial of epinephrine stored in an unlocked box for a multi-use vial of decadron because these vials were similar in appearance. In contrast, in this case, Poindexter removed what he believed to be a single-use vial of anzemet from a drawer in a locked medications cart in a location where anzemet was regularly stored. And significantly, Poindexter himself, and not a nurse or technician, administered the medication on April 19, 2002. Thus, this case involved a different drug, a different person, a different size vial, and a different storage location. The January 2002 events were not sufficiently similar to the events of this case to warrant the inference that Poindexter consciously disregarded the risk that he may have confused a different medication for epinephrine. If Poindexter could be held liable for willful and wanton conduct in this case, then any member of a clinic or hospital would be subject to punitive damages if a single employee had previously failed to read a label and administered the wrong medication, no matter the circumstances Such an expansive definition is inconsistent with the "heavy burden" placed on plaintiffs in Virginia to prove punitive damages. *See Cummings,* 857 F.Supp. at 505. Thus, partial summary judgment must be granted on plaintiff's claim for punitive damages against Poindexter.

---

**6.** Poindexter's perception of the January 2002 incidents at the time he was treating plaintiff is the key inquiry because Poindexter's reasonable belief bears on whether he consciously disregarded the risk to plaintiff when he mistakenly administered the epinephrine.

## 2. Austin–Weston

■ As an initial matter, it is clear that Austin–Weston may not be held liable for punitive damages on a theory of *respondeat superior.* First, if Poindexter did not willfully or wantonly disregard the risk that his actions would cause harm to plaintiff, it follows that Austin–Weston may not be held liable for punitive damages on a theory of derivative liability. Second, even assuming punitive damages could be awarded against Poindexter, it is well-settled that "punitive damages cannot be awarded against a master or principal for the wrongful act of his servant or agent in which he did not participate, and which he did not authorize or ratify." *Hogg v. Plant,* 145 Va. 175, 133 S.E. 759, 761 (1926). And while plaintiff broadly alleges in the complaint that Austin–Weston ratified, accepted, or condoned Poindexter's actions,[7] plaintiff neither alleges nor offers proof of any facts to support her claim that Austin–Weston either authorized the administration of epinephrine to plaintiff or that it ratified the negligent conduct. *See Pullman Co. v. Hall,* 46 F.2d 399, 404 (4th Cir.1931) (holding that mere retention of a servant in the service of a master, without other evidence, does not amount to ratification).

■ Yet, the analysis does not end there because plaintiff argues that Austin–Weston is liable for punitive damages not only on a derivative liability theory, but also on the basis of Austin–Weston's own negligence in failing to implement *effective* medication distribution policies as evidenced by Austin–Weston's failure to prevent a third mistaken epinephrine injection only four months after the first two.[8] Plaintiff appears to rely on two theories in an attempt to overcome summary judgment on the issue of punitive damages. First, plaintiff argues that it is a disputed issue of fact whether defendants effectively communicated their new policies to their employees. Specifically, plaintiff argues that Austin–Weston (1) did not put its new policies in writing, (2) has no documentation proving that the alleged corrective measures were actually implemented and conveyed to Austin–Weston's employees, and (3) failed to provide any sign-in sheets to prove that it conducted safety meetings on Monday mornings. As recounted at length in the facts above, multiple defense witnesses have stated under oath numerous changes implemented after January 3, 2002 to avoid future mistaken administrations of medication. Plaintiff cannot raise a disputed issue of material fact merely by arguing that defendants failed to produce any documentary evidence of these changes; rather, to survive summary judgment, plaintiff must offer affirmative evidence of her own. *See Anderson,* 477 U.S. at 256, 106 S.Ct. 2505 (holding that non-moving party "may not rest upon mere allegations or denials ... but must set forth specific facts showing that there is a genuine issue [of material fact]."). Plaintiff has offered no such evidence to counter the deposition testimony offered by defendants. Moreover, even were she to offer such evidence, this dispute is not *material.* Even if Austin–Weston did not effectively communicate its new prevention policies to other employees, Poindexter well knew the dangers of mistakenly injecting a patient

---

7. *See* Complaint ¶ 44.

8. To be sure, if Austin–Weston kept two medications, one safe and one harmful, next to each other and in unmarked containers, even if different employees at different times genuinely mistook the harmful medication for the safe one, after repeated incidents, Austin–Weston might well be subject to punitive damages for failing to change its policies to prevent future mishaps from its employees' simple negligence.

with epinephrine and knew that he should have checked the label before he administered the medication in the vial. Thus, plaintiff's first argument to overcome summary judgment fails.

Second, plaintiff argues that a reasonable jury could conclude that the policies implemented by Austin–Weston were so deficient that they manifested a conscious disregard for the safety of its patients. Specifically, plaintiff argues that Austin–Weston acted with willful or wanton negligence when, in addition to the steps already taken, (1) it failed to conduct additional and separate training sessions to instruct its employees on safety and the new prevention policies and (2) continued to store its epinephrine in containers that resembled the containers holding other medicines and in a nearby location where its employees could mistake the epinephrine for these other medications. Yet, to establish willful and wanton negligence, plaintiff must demonstrate that Austin–Weston's failure to take these additional steps evinced a "reckless indifference to consequences with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another.'" *Doe*, 579 S.E.2d at 176 (quoting *Woods v. Mendez*, 265 Va. 68, 574 S.E.2d 263, 268 (2003)). This is simply not the case here. The undisputed record reflects that Austin–Weston took several steps after January 3, 2002 to avoid similar harm to its patients, including storing epinephrine in single-use vials to avoid confusion with decadron, requiring its physicians to supervise personally all administrations of medication, storing the epinephrine in a secure and locked location, and posting signs to remind its employees to double-check all medications. These steps do not evince reckless indifference—indeed they contradict it and evince instead an attempt, with the knowledge available at the time, to avoid future injury to Austin–Weston's patients. While Austin–Weston's failure to take still further steps to address the risk may have been negligent, a reasonable jury could not conclude that Austin–Weston acted in this case with reckless indifference. Thus, plaintiff's second argument is also unpersuasive and her punitive damages claim against Austin–Weston must fail.

Accordingly and for the reasons stated,

It is **ORDERED** that all claims against defendant Jane Doe, R.N., are **DISMISSED** without prejudice.

It is further **ORDERED** that defendants' motion to strike and/or for partial summary judgment on punitive damages is **GRANTED** and, accordingly, the punitive damages claim is **DISMISSED** against all remaining defendants.

While Poindexter appears to have conceded negligence, it remains to be clarified whether Austin–Weston concedes negligence both on derivative master-servant grounds and also for failing to take and effectively implement appropriate steps to address the risk of erroneous injections.

Accordingly, to ensure the clarity of the record and to provide a proper basis for jury instruction,

It is further **ORDERED** that defendants file on or before 12:00 p.m. on Monday, December 13, 2004, an appropriate pleading setting forth whether both defendants concede negligence and, if so, on what basis.

The Clerk is directed to send a copy of this Order to all counsel of record.